18110

SOUTHERN RAILWAY COMPANY, Appellant, v. WILKINSON TRUCKING COMPANY, Inc., and Carolina Casualty Insurance Company of Jacksonville, Florida, Respondents.

(132 S. E. (2d) 491)

*Messrs. F. Dean Rainey,* of Greenville, and *Sam R. Watt,* of Spartanburg, *for Appellant,*

*Michael G. Plumides, Esq.,* of Charlotte, *for Respondents,*

September 9, 1963.

BRAILSFORD, Justice.

A collision at a grade crossing between a locomotive engine and a tractor-trailer resulted in damage to both. The railway company brought an action against the trucking company for its damages and the trucking company filed a counterclaim. The court overruled the railway company's motion for a directed verdict as to the counterclaim, and the jury returned a verdict in favor of the trucking company for $6,038.99. The railway company has appealed from an order overruling its alternative motions for judgment n. o. v. and for a new trial.

The sole ground on which appellant moved for a directed verdict at the trial was that the respondent's driver was guilty of gross conributory negligence as a matter of law. The motion for judgment n. o. v. was on this ground and on the additional ground that there was no evidence to support a finding that appellant was guilty of actionable negligence. A motion for judgment n. o. v. may be granted only upon one of the grounds of a motion for the direction of a verdict made during the trial. Therefore, the additional ground may not be considered. *Standard Warehouse Co. v. A. C. L. R. Co.,* 222 S. C. 93, 71 S. E. (2d) 893; *Thomas v. Atlantic Coast Line R. Co.,* 221 S. C. 462, 71 S. E. (2d) 403.

The collision occurred at about 10:30 a. m. on Walnut Street crossing in Gaffney, South Carolina. Double

tracks of the appellant run approximately north and south through Gaffney. At the location in question, the railway tracks are parallel with and between two streets or highways—Cherokee Avenue, also known as Highway 29, on the west, and Railway Avenue on the east, each of the streets being twenty to twenty-five feet from the nearest rail. Walnut Street intersects Railway Avenue from the east, crosses the tracks and enters Cherokee Avenue. The latter is a through highway and a stop sign is located between the railway tracks and the intersection, requiring traffic to stop after crossing the tracks from the east and before entering Cherokee Avenue.

Respondent's driver, after making a delivery on Railway Avenue, proceeded in a northerly direction to the Walnut Street intersection and crossing. He was driving a tractor-trailer approximately fifty feet in overall length. According to his testimony, he made a sweeping left turn (necessary because of the length of the vehicle) into Walnut Street and stopped some five feet from the first track. He looked in both directions, having a clear view toward the north of from one-half to three-quarters of a mile. He saw no approaching train and heard no signal by whistle or bell. We quote from the direct examination of the witness:

"Q. What did you do, after having stopped and looked both ways?

"A. I put her in second gear and proceeded on across the crossing at approximately five miles an hour. When I proceeded to the other side to make my left turn to go south on Cherokee Avenue, I stopped for the stop sign, and a car was coming north on Cherokee Avenue.

"Q. North on Cherokee, going towards Charlotte, on Cherokee, or Highway 29?

"A. That's right. He had his right turn signal on, and I couldn't pull out with him making a right turn without dragging him with the trailer, so I had to wait until he made his turn, and he decided not to make a turn and went straight on Cherokee Avenue. Just as I started to move,

that is when the collision—that is the last thing I remember.

"Q. Do you have any idea as to how long you were stopped there prior to your being struck?

"A. I would say approximately, maybe a minute.

"Q. Did you hear the train whistle blow or bell ringing prior to being struck?

"A. No, sir. I never heard a bell or whistle or anything whatever."

The witness further testified that after the signaling car on Cherokee Avenue went by, he sat there for a while, he "was waiting, and that is when the collision happened." We quote from his cross examination on this point.

"Q. Now you say after that car that started into Walnut Street drove on up Cherokee Avenue, you sat there?

"A. No, sir. When I pulled across and stopped at the sign, this car was going north on Cherokee Avenue, with his right turn signal on to make a turn into Walnut Street, and I had a 40 foot van, and if I pulled on out—I had already stopped—if I had pulled on out into Cherokee Avenue I would have struck his car when I made my left turn.

"Q. Well, now, he went on by you, didn't he?

"A. He pulled up and stopped, and then backed up and changed his mind and went on up Cherokee Avenue.

"Q. But you never did start up any more, did you?

\* \* \*

"A. No, sir, I was still stopped.

\* \* \*

"Q. And there was ample room for you to pull out then, wasn't there?

"A. No, sir. Oncoming traffic was moving in."

At another point in his cross examination, the witness testified that traffic was moving north and south on Cherokee Avenue and that he "couldn't pull out in the road in front of traffic." He further testified that while he was stopped

there, his attention was on this traffic. "All I was trying to do was get into Cherokee Avenue."

The train approached the crossing from the north, traveling at from 30 to 35 miles per hour according to the testimony of the engineer. The sight distance between the crossing and the approaching locomotive was variously estimated at from one-half mile to one and one-half miles. The next crossing north of Walnut Street is Third Street, also referred to as the schoolhouse crossing, the distance between them being 1324 feet.

The engineer testified on direct examination that as he came up on the schoolhouse crossing, he saw the tractor-trailer; it "drove up on the crossing and stopped. *Apparently stopped, because it couldn't get out in the highway, apparently.*" He qualified this statement by testifying that he was four or five hundred feet from Walnut Street crossing when he saw the tractor-trailer pull up on the track, whereupon he immediately applied the emergency brakes. The twelve car train, pulled by two locomotives, stopped with the third car on the crossing, having traveled an estimated 1000 to 1100 feeet after the application of brakes.

During the cross examination of the engineer, he testified that the tractor had crossed the tracks and that the trailer was "standing on the crossing" when he first saw it. "The trailer part was on the track. The tractor-trailer was over it." In response to a question by the court, he adhered to the statement that the trailer was standing on the track when he first observed it. Later in his cross examination, he stated that the "truck moved up on the track practically 6 or 8 to ten feet when I saw him."

Since the testimony and all inferences to be drawn therefrom must be viewed in the light most favorable to respondent, it would serve no useful purpose to review the evidence of the other witnesses. Suffice it to say that some of the testimony tends to support the inferences to be drawn from the testimony of the truck driver

that the statutory signals were not given by the locomotive and that the trailer was stopped on the track, in plain view of the engineer, for a considerable time before the impact. The testimony of other witnesses strongly contradicts that of the truck driver on both points.

We are satisfied that the issues of contributory negligence and recklessness of the truck driver were properly submitted to the jury. It is reasonably inferable from the testimony that the locomitive was more than a half mile from the crossing when the driver looked to his right before entering upon the track, and that it was either not visibile to him or was at a point so distant from the crossing as not to constitute an apparent hazard to a driver in the exercise of due care. It is also inferable that the driver had ample time to clear the track before the arrival of the locomotive had it not been necessary for him to stop and wait for traffic on the through highway to pass. Under these circumstances, whether his stopping on the track and remaining there until the collision resulted from negligence on his part was a question for the jury. The motion for a directed verdict on the ground assigned was properly overruled.

Appellant next contends that the court erred in instructing the jury as to the doctrine of last clear chance and in failing to grant its motion for a new trial on this ground.

The main burden of appellant's argument on this point is that the only reasonable inference from the evidence is that the engineer applied his emergency brakes as soon as he saw the truck stopping on the track; that he made a good stop, and that the train could not have been stopped in time to have avoided the collision. While these inferences are strongly supported by some of the testimony, they are not the only inferences which can be drawn. The jury could have concluded from the testimony of the engineer that he observed and comprehended the plight of the truck driver when the locomotive was 1300 feet from the crossing, in time to have avoided

the collision by prompt application of brakes. The engineer's sight distance as he approached the crossing was at least several times the distance required to stop the train. It is inferable from some of the testimony that the trailer was stopped on the track, blocked by traffic on the highway, when the locomotive was yet 2000 to 3000 feet from the crossing. Whether, in the exercise of due care, the engineer had a last clear chance to avoid the collision was a question for the jury. The applicable doctrine was properly included in the instructions.

The last exception charges error in refusing appellant's motion for a new trial upon the ground of improper argument to the jury by respondent's counsel. Mr. Plumides, a member of the North Carolina bar and of counsel for respondent, stated in argument to the jury, in effect, that his client had no insurance and would have to pay its own bills. This had reference to collision insurance covering damage to the truck, not to liability insurance. The court promptly ruled that the statement was improper, refused appellant's motion for a mistrial, and appropriately admonished the jury. These instructions were repeated in the main charge. In his comprehensive order refusing a new trial on this ground, the trial judge concluded that, under the peculiar facts of this case, no prejudice was shown. We are not convinced that he abused his discretion or erred in this conclusion.

Affirmed.

TAYLOR, C. J., and Moss, LEWIS and BUSSEY, JJ., concur.